BLACKWOOD *v.* FARMERS BANK & TRUST COMPANY.

4-5930 141 S. W. 2d 1

Opinion delivered May 27, 1940.

*Wils Davis,* for appellant.

*Roy Penix, Shane & Fendler* and *Holland & Taylor,* for appellees.

MEHAFFY, J. The appellant, D. H. Blackwood, rented his farm in Mississippi county, Arkansas, to M. L. Hawkins for the year 1937 and executed a waiver of the rents in favor of the Farmers Bank & Trust Company in the sum of $1,350. It is not claimed that any other written waiver was made. Hawkins produced on the farm 81 bales of cotton. The first lot of cotton was 49 bales sold to Jake Ungar Gin Company. Out of the proceeds of this 49 bales, the gin company paid to the Farmers Bank & Trust Company, $1,350, which was the amount of the note due from Hawkins to the bank, for which the bank held a waiver from Blackwood. This left a balance of $893 proceeds from the sale of the 49 bales. The other lot of cotton contained 32 bales, which were mortgaged to the Farmers Bank & Trust Company, which sold the mortgage to the Commodity Credit Corporation.

Blackwood first filed suit in the circuit court of Mississippi county for an attachment to enforce his landlord's lien. Blackwood then filed suit in the chancery court against Jake Ungar Gin Company and its president, Matt Scruggs, and later filed suit against the Farmers Bank & Trust Company and Commodity Credit Corporation. Thereafter the Commodity Credit Corporation instituted an action in the chancery court against all of the parties, including Blackwood, and these causes were consolidated and tried in chancery court.

Blackwood, in his complaint, alleges that he rented certain lands to the defendant. Hawkins, for $2,880 for the year 1937, $300 of which had been paid. Certain property attached in the action in the circuit court was sold and brought approximately $900, leaving unpaid $1,732.50, which included interest from November 15, 1937. The Jake Ungar Gin Company had purchased 49

bales of the cotton raised on the Blackwood land, and it was alleged that it had either secreted or sold the 49 bales; that Blackwood had a landlord's lien on the cotton and prayed judgment fixing a lien upon the proceeds of the sale.

The defendant, Scruggs, answered denying the allegations of the complaint. The Jake Ungar Gin Company answered, making general denial, and alleged that Hawkins executed a note and mortgage to the Farmers Bank & Trust Company conveying the crops grown by Hawkins on the premises rented from Blackwood, and that Blackwood had executed a waiver of his lien on the 49 bales of cotton. $1,484.12 was paid to the bank in satisfaction of its note and mortgage. Thirty-two more bales of cotton were ginned by the gin company, and it is alleged that they were sold or mortgaged to the Commodity Credit Corporation; that 24 bales had been ginned for which Blackwood had receipts, and that all these transactions were with the consent and knowledge of D. H. Blackwood.

M. L. Hawkins filed an answer and counter claim, alleging that Blackwood had wrongfully taken personal property of the value of $3,166.

In the case of *Blackwood versus Farmers Bank & Trust Company and Commodity Credit Corporation,* Blackwood filed a complaint alleging practically the same facts contained in his complaint against the gin company. He set out and described the 32 bales of cotton, and alleged that the Farmers Bank & Trust Company and the Commodity Credit Corporation purchased this cotton with knowledge of the fact that Blackwood held a landlord's lien thereon, and prayed judgment for the proceeds.

In this last mentioned case, the Farmers Bank & Trust Company filed answer alleging that it had a loan note from Hawkins and waiver from Blackwood, and that the proceeds of the cotton received by the bank was in payment of this loan. It also alleged that the transactions were carried on and conducted with the

knowledge and consent of Blackwood, and that he was estopped to make any claim against the bank; that the loan was made by the Commodity Credit Corporation through the bank with the consent and knowledge of Blackwood, and that the bank did not know of any lien that Blackwood had.

In the case of Commodity Credit Corporation and others against Hawkins and others, the Commodity Credit Corporation filed a complaint against all the parties interested in these transactions, including Blackwood. It alleged that on November 11, 1937, Hawkins gave the bank a note and loan agreement and mortgage for the sum of $1,458.45, pledging the 32 bales of cotton in which Hawkins represented himself as the landlord, and listed no liens, and alleged that Hawkins pledged the 32 bales of cotton to secure a note to the Farmers Bank & Trust Company, and that it had a first lien to secure the payment of the $1,350 note executed by Hawkins to the bank; that a portion of the proceeds or cash raised from the cotton producer's note was paid to the Farmers Bank & Trust Company to satisfy a mortgage lien which it held to secure the note of M. L. Hawkins, and alleged that Blackwood received $300 as the proceeds of the loan. It also alleged that the note had been pledged to the Reconstruction Finance Corporation; that by reason of pledging the note, the lien of the Commodity Credit Corporation was superior to that of Blackwood, and prayed judgment and for foreclosure of the 32 bales of cotton, and in the alternative, if the lien of Blackwood be found prior and paramount, that it should be subrogated to the rights of the defendant, Farmers Bank & Trust Company, and Blackwood; and that Blackwood and the Federal Compress Company and Jake Ungar Gin Company be enjoined from proceeding further in the action pending in the circuit court.

The Farmers Bank & Trust Company filed an answer admitting that Hawkins produced the cotton as a tenant of Blackwood, and that he represented that there were no liens; that, in fact, both the bank and gin com-

pany had liens, and it alleged that Hawkins became indebted to it, secured by a lien, to the amount of the waiver due Blackwood who knew all of the arrangements; it admitted that the account of the bank was paid from the proceeds of the cotton, and that the gin company may have advanced some money before the loan was made, and alleged that Blackwood was estopped to claim against either the Commodity Credit Corporation or the defendants, because he consented to the handling of the account by the gin company and received a part of the proceeds. It afterwards filed an amendment to its answer and cross-complaint setting up the facts with reference to the waiver, and alleged that it loaned $400 to Hawkins in three notes, secured by chattel mortgage on crops and stock of defendant, Hawkins; that if the funds belonged to Blackwood, the bank was entitled to a judgment against Hawkins; but since Blackwood had received more on the sale of the stock under attachment than he can claim, the bank is entitled to have the amount of the lien impressed upon the proceeds of the sale. It also alleged that one, Applebaum, a cotton buyer, who handled all the government cotton, paid the proceeds of the loan on the 32 bales to the gin company and transferred the note to the bank, and the note showed no lien; that Hawkins' debt was paid before the loan was made, the last balance being advanced by the gin company, which also advanced Blackwood some money on the proposed loan, with the understanding with Blackwood that the loan would be made; the bank thereafter filed an amendment to its answer and cross-complaint denying that Blackwood, Commodity Credit Corporation, or Reconstruction Finance Corporation were entitled to any kind of a judgment, and alleged that if they were, the bank was entitled to a judgment over against Jake Ungar Gin Company and Matt Scruggs. The gin company filed an answer of general denial and alleged that Blackwood was estopped to assert any rights to the proceeds of the cotton.

Blackwood filed an answer denying that for a valuable consideration on November 10, 1937, defendant,

Hawkins, executed a note and mortgage to Farmers Bank & Trust Company for $1,458.45, and pledged the warehouse receipts of the 32 bales of cotton, and denied all the allegations of other parties with reference to the 32 bales of cotton.

The chancellor found, that for the year 1937, Blackwood rented to defendant, Hawkins, for the sum of $2,880 certain lands in Mississippi county from which Hawkins gathered 81 bales of cotton; 49 bales of which were sold to Jake Ungar Gin Company by Hawkins without the consent or knowledge of Blackwood, and 32 bales of cotton were, without the consent or knowledge of Blackwood, mortgaged by Hawkins to the Farmers Bank & Trust Company to secure a note in the sum of $1,458.45, which note and mortgage were transferred to the Commodity Credit Corporation and bear interest at the rate of 4 per cent. per annum; that Blackwood executed a waiver of his landlord's lien to the extent of $1,350 for the year 1937 to the Farmers Bank & Trust Company; the 49 bales of cotton mentioned were the first bales gathered from said land, and the purchase price paid therefor by the gin company, $2,243.18, out of which the $1,350 note and interest for which Blackwood had waived his lien, was paid to the gin company, a balance of $893.18 was paid to Hawkins; that on November 6, 1937, Hawkins procured from Jake Ungar Gin Company a check for $300 and delivered it to Blackwood, stating to him that it was the balance of proceeds of the sale of the 32 bales of cotton. On November 10, 1937, Hawkins executed and delivered to the bank the note and mortgage referred to on said 32 bales of cotton, and out of the proceeds thereof there was refunded to the gin company $300, so paid to D. H. Blackwood; that Blackwood, by accepting the $300, waived his landlord's lien on the 32 bales of cotton. The court therefore ordered and decreed that the Commodity Credit Corporation have and recover from Hawkins the sum of $1,458.45 with interest from date of note until paid at the rate of 4 per cent.; that the said 32 bales of cotton be delivered to the Commodity Credit Corporation to be sold or disposed of

pursuant to the agreement set out in said note and mortgage or in any manner it sees fit, and that any interest, title or claim of the other parties in this cause in and to said 32 bales of cotton, be canceled and held for naught, writ of attachment discharged and released. It was further ordered and decreed that Blackwood have and recover from the defendant, Hawkins, $1,553.34 with interest at 8 per cent. per annum, and that he recover from the defendant gin company the sum of $893, balance of the proceeds of the 49 bales of cotton, which amount, when paid, shall be credited on a judgment in his favor against Hawkins. It was further ordered and decreed that the complaints of Blackwood and Commodity Credit Corporation against the bank be dismissed.

The Commodity Credit Corporation and Farmers Bank & Trust Company prayed cross-appeals and parties entered their appearance.

It is admitted that Blackwood was the landlord, that he had a lien under the statute for rent, and that he executed a waiver for a specified amount. The question here is whether Blackwood waived his rent by his conduct or acts after the written waiver. The chancellor held that by accepting $300 he waived his lien for rent.

Hawkins testified that he had rented land from Blackwood for five years, and in 1937 rented the land for $2,880; that he borrowed $1,350 from the Farmers Bank & Trust Company for which he gave the bank a mortgage; introduces as exhibit to his testimony the waiver. He states that the loan was increased by $400, but it seems to be all right with Blackwood, because witness said he had done it before. He supposed Blackwood knew he had sold the 49 bales. Blackwood had not been on the place until Hawkins had put the 32 bales in the loan. He went to Scrugg's office to discuss the 32 bales, but Blackwood was not present. Scruggs was the acting president of the gin company, and said he left $300 there, and that Blackwood got the check. The cotton had been put in the government loan, and that was where he got the $300. He said he sold cotton during the five years

he was on the place and Blackwood never objected; that Mr. Haynes, bookkeeper of the gin company, went with him to put it in the government loan; he did not talk to the bank about the loan; did not know the loan was being made by the bank, but after he had read the note which was handed to him, he said he imagined the gin company filled it out; Scruggs advised him about putting it in a loan; he represented himself as landlord in the contract because he was renting for cash; Blackwood did not say to sell the cotton; he knew Hawkins had put it in the government loan; he always let him sell cotton; Blackwood had been sick; does not think he told Blackwood he had sold the cotton to the Mid-South Cotton Growers' Association; Blackwood told him if he needed more money, to get it at the gin; Blackwood told Scruggs, Haynes and Barnett to let Hawkins have money when he needed it; he does not know that Blackwood told them that, but he never told them not to; Blackwood was not present when he executed the mortgage; the waiver was dated the same day as the mortgage, March 5, 1937; Blackwood said it was all right for him to sell cotton; he always told him that.' He testified that Mr. Jenkins was present when he talked to Blackwood, and that Sam Buck was present; neither of these witnesses, however, testified.

W. M. Scruggs, acting president of the gin company, testified that all the cotton Hawkins had raised since 1933 was ginned at his gin, which also handled the sale of the cotton raised on the Blackwood place; the first year Hawkins got his money from Clarence Wilson; Blackwood agreed that the gin company was to sell the cotton and leave one-fourth for Blackwood; the first year the record of Blackwood's one-fourth was kept in an individual book; Hawkins would sell when he got ready; in 1936 he left $2,750 for Blackwood; Blackwood told him to let Hawkins have anything in reason to be paid out of the cotton; he understood that the gin company was to be paid before the rent was paid; the $300 was given Blackwood before the cotton was in the loan; Applebaum represented the Commodity Credit Corpora-

tion; he told Blackwood the gin company was advancing Hawkins on an eight-and-a-half cent basis; Blackwood did not object; the second year Blackwood told Hawkins to draw on him when he needed his money, but since two drafts were returned, Scruggs furnished him that year.

Applebaum, a cotton buyer, testified in behalf of the Farmers Bank & Trust Company; he had an agreement with Scruggs to handle all government loans for 25 cents a bale; according to his information, there were no liens on the cotton; on the 32-bale transaction they got it certified at the Mid-South Cotton Growers' Association for nine cents; Hawkins and Haynes were present, Blackwood was not; he knew Hawkins rented from Blackwood; he asked if there was a mortgage on the 32 bales; he talked with both Hawkins and Haynes, and the information in the note came from one or the other of them; Haynes got the check; he does not remember if Hawkins and Haynes told him of the waiver; the only source of information for what he put in the note was from Hawkins or Haynes; he knew Hawkins was connected with Blackwood, but did not know the source of the cotton; did not know of his own knowledge where the cotton was raised, nor if there were any liens; he was not employed with the bank nor connected with the Commodity Credit Corporation.

F. E. Warren, cashier of the Farmers Bank & Trust Company testified that he handled the loan on the 32 bales; Applebaum was not the agent of the bank; the bank would discount notes either indorsed to them or with it as payee; had no recollection of the gin company purchasing the 49 bales; the bank knew that Blackwood was the landlord; he knew about the waiver, but not the amount.

Hawkins, recalled, testified that on November 6, 1937, he delivered the note to Blackwood; does not remember if there was any discussion about advancing money, in the presence of Blackwood.

E. F. Haynes testified that he was cashier and bookkeeper for the gin company; the loan on the 32 bales

was discussed with Blackwood by Scruggs and himself at the gin office; Blackwood was told the bank had been paid, and he made no objection; the Applebaum Cotton Company paid the gin company; Blackwood expressed no dissatisfaction with the way it was handled. He gave Blackwood the $300 on November 6th, and told him it was the balance on 32 bales. He, and not Hawkins, gave Blackwood the check. He and Scruggs did not conceal from Blackwood that the gin company had the 32 bales or receipts, when the $300 was paid; he told Blackwood about paying the $300 Hawkins' note, but not about the other note, because Blackwood was not there; Blackwood was not there after he sold the 49 bales until they started to put the 32 bales in the loan; did not know that Blackwood was sick at the time; Blackwood told him in June to let Hawkins have anything he wanted; he never told Blackwood any time about the 49 bales.

The appellant, D. H. Blackwood, testified about renting the land to Hawkins for $2,880 and waived his rent to $1,350 to the bank, but made no other waiver; he had not authorized Hawkins to borrow money; he received in the attachment suit $1,326.66, leaving a balance of $1,553.34; the $300 was received before the attachment suit and bears no interest; he had not been in the gin since the fall of 1936 and had not authorized the gin company to sell his cotton; on November 3rd or 4th he saw Hawkins loading hay, and Hawkins said he had not sold any cotton, but was going to sell hay to pay insurance; witness told him to meet him at the gin Saturday to sell some cotton; Hawkins gave him a check Saturday saying he had sold 32 bales to the Mid-South Cotton Growers' Association; that is the reason he sued that company; he figured that the 32 bales paid the bank; he did not learn of the 49 bales until the day he talked to Mr. Davis to start suit; Haynes gave him a list including the 49 bales, but he never discovered the compress numbers; the $300 check was on the gin company; he talked with Hawkins and Scruggs at Scruggs' office the day he got the check, and told Hawkins he had no right to sell his cotton, that he always sold it himself; that

Hawkins said he used it for chopping; he found out that the bank had been paid about $1,500; he never authorized Hawkins to sell the cotton. There was not a bale sold without his authority except in 1933 and 1937; he never told Scruggs to let Hawkins have anything in reason; he would not be that dumb; he never indicated to Haynes that the gin company could handle this as they saw fit; he did not, in the presence of Haynes, discuss this business with Hawkins.

Hawkins was recalled by the defendant and testified that the gin company always gave Hawkins their check and he would indorse it to the bank; Hawkins always sold the cotton; always got advancements from the gin company. In 1936, he borrowed $1,350 from the bank, told Blackwood he would need more for chopping and Blackwood told him to get it at the bank; he borrowed about $500; in 1937, he did the same as in 1936 and he discussed borrowing chopping money with Blackwood.

The evidence of Hawkins given in the trial in the circuit court was introduced, and he told Blackwood there were 30 to 60 bales and he would give them to Blackwood above the expense; he borrowed in his name from the Commodity Credit Corporation on 32 bales and paid the bank and gin company; he paid the $1,350 note out of the 49 bales as far as it would go; he paid $300 to Blackwood; Blackwood never told Hawkins to sell his cotton; he knew he sold hay to Scruggs and said it was all right; Blackwood said whatever Hawkins did about selling it was all right; he did not know if Blackwood definitely told him to sell in 1937, but he never told him not to.

When the above evidence is considered, together with the circumstances, we think it falls far short of showing that Blackwood waived his rent in 1937, except the written waiver on March 5, 1937, and in the letter to the bank he expressly stated: ''The amount of this waiver is not to exceed ($1,350) Thirteen Hundred Fifty & 00/100, and this letter is your authority to make such furnish, and the amount furnished, with interest, shall be a lien on said crop paramount to my lien as landlord.''

Hawkins testified that he had, in former years, sold cotton. That may be the reason that Blackwood executed the waiver and expressly limited the amount to $1,350. The witnesses for the bank disagree as to who paid Blackwood the $300, but everything said by these witnesses might be true, and still it does not amount to a waiver by Blackwood of his landlord's lien for rent, and certainly, when considered in connection with the waiver executed and delivered to the bank, it does not show a waiver. If Blackwood had been permitting Hawkins to sell his cotton, why was a waiver necessary? Why should there be a written waiver expressly limiting the amount to $1,350?

When the bank loaned this money, it had in its possession the waiver of Blackwood, expressly limiting the amount.

"It may be regarded as a well settled principle that a lien fairly acquired cannot be destroyed in favor of one having a notice of that lien, unless it be by some act of the party in whose favor it exists. The courts cannot divest it, and much less can the ministerial officers of the law do so. If they could do so, it would be but a lien *sub modo,* whereas the law annexes no qualification. To sustain this loss of lien it must be placed on one or the other of two ideas—intentional waiver or from the loss of possession. As to the first, authority is abundant to show that one will not be held to have waived a lien unless the intent be express or very plain and clear. The presumption is always against it." 17 R. C. L. 605, 606; *McBride* v. *Beakley, et al.,* 203 S. W. 1137; *Walter J. Lambert* v. *P. Nicklass, et al.,* 44 W. Va. 527, 31 S. E. 951, 44 L. R. A. 561, 72 Am. St. Rep. 828; *Fletcher* v. *Dunn,* 188 Ark. 734, 67 S. W. 2d 579.

The evidence of the appellees shows conclusively that when the check was received by Blackwood, no sale had been made, and Blackwood did not authorize or ratify the sale; he did not do anything, according to the evidence, that deceived any of the parties.

But it is contended by the appellees that the bank was an innocent purchaser or lender for value. We do not

agree with this contention, because the bank knew that Blackwood had executed a waiver, knew the amount of it, knew that Hawkins was a tenant on Blackwood's farm, and could very easily have ascertained if Blackwood wanted to waive his lien for any additional amount.

Appellees refer to the case of *Medendorp* v. *Washington*, 191 Ark. 1077, 89 S. W. 2d 730, but it is stated in that case: "The court found the fact to be that the persons who bought the cotton herein, bought it in good faith and without knowledge of plaintiff's lien, and that there is no equity in the bill."

As we have already said, in the instant case the bank knew all about Blackwood's lien, and knew that he had waived it to the bank itself for $1,350, and there would have been no difficulty in communicating with Blackwood.

Another case referred to and relied on by appellees is *Van Etten* v. *Lesser-Goldman Cotton Co.*, 158 Ark. 432, 250 S. W. 338. In that case the court said: "For the law is that, while one buying cotton subject to a landlord's lien is not liable as for conversion if he has no knowledge of the lien, yet if the purchaser is in possession of facts sufficient to put him upon notice that the cotton is subject to the lien of a landlord, good faith requires him to pursue the inquiry to the extent of investigating the facts of which he has knowledge, and, if reasonable diligence in the investigation of these facts would have led to the knowledge of the actual existence of the lien, then the purchaser is liable for a conversion, just as he would have been had he possessed the actual knowledge."

There is some evidence tending to show that Blackwood, in former years, had permitted the sale of cotton by Hawkins; that is, that he waived his lien.

"A landlord's statutory lien is a paramount lien of which every person must take notice, and can be lost as a general rule only by waiver or by failure to enforce it at the proper time. A landlord's lien is not lost by the form of execution in which he seeks to enforce it, and a refusal of the county court to recognize a landlord's lien will not defeat the lien. A landlord's lien for supplies

is not lost by failure to enforce it in the manner prescribed for the enforcement of a lien for rent. A landlord's lien is not displaced by an assignment of the tenant's property for the payment of debts, and it is not destroyed by the fact that, at the time of issuing his attachment, the goods were in the custody of the law or by the conversion of the property into money by a receiver appointed by the court.'' 36 C. J., 525.

It follows from what we have said that the decree on appeal must be reversed, and since there seems to be no dispute about the amount, judgment will be entered here in favor of the appellant and against the bank for $854.33. As to the cross-appeal and the direct appeal of the bank, all the appellees knew the facts and circumstances, and the bank, especially, knew because it had Blackwood's written waiver. The decree on cross-appeals and direct appeal of the bank is affirmed.

GRIFFIN. SMITH, CJ., not participating.